Filed 7/2/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| OAKLAND UNIFIED SCHOOL DISTRICT,<br><br>      Petitioner,<br><br>v.<br><br>PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>      Respondent;<br><br>OAKLAND EDUCATION ASSOCIATION, CTA/NEA,<br><br>      Real Party in Interest. | A171007<br><br>(Public Employment Relations Board Decision No. 2906 Case No. SF-CO-864-E) |

Ever since the Legislature began giving public employees the right to collectively bargain through laws like the Educational Employment Relations Act (EERA), Gov. Code,[1] §§ 3540–3549.3, the issue of whether strikes are legal under those laws has been lurking in the background. Despite this, no California court has squarely addressed this issue. We fix this curious omission and hold that public school employees may engage in unfair practice strikes under EERA.

The Oakland Education Association, CTA/NEA (OEA) is the exclusive representative of certain employees of the Oakland Unified School District

---

[1] All further statutory references are to the Government Code unless otherwise stated.

1

(District), a public school employer. Following a dispute over school closures[2] approved by the District, OEA members conducted a work stoppage (strike) that lasted one day.

OEA filed an unfair practice charge with the Public Employment Relations Board (PERB), claiming that the District committed unfair practices in violation of EERA when it approved the school closures. As often happens in these labor disputes, the District filed a competing unfair practice charge with PERB, claiming that OEA's one-day strike constituted an unfair practice in violation of EERA. After PERB issued separate complaints based on these competing charges, the parties agreed to bifurcate the hearing on their two complaints. In its first decision, PERB held that the District violated EERA; in its second decision, PERB held that OEA did not.

The District does not challenge the first PERB decision. Instead, it challenges the second PERB decision, which upheld the legality of OEA's strike because it was provoked by the District's unfair practices (unfair practice strike) and because OEA negotiated in good faith. We reject the District's challenge. In doing so, we conclude that PERB did not clearly err in finding that unfair practice strikes are allowed under EERA. We further conclude that OEA's unfair practice strike—which lasted one day—did not violate the rights to education, due process, or equal protection and that neither EERA nor the due process clause prohibits pre-impasse unfair practice strikes conducted before PERB has determined that the public school employer has, in fact, committed an unfair practice. Finally, we conclude

---

[2] We use the terms "closure," "close," and "closing" to refer to any closure of, consolidation of, or truncation of grades in schools.

2

that PERB erred by excluding evidence of educational harm but that this error was harmless. We therefore affirm.[3]

## STATUTORY BACKGROUND

We begin with an overview of EERA and its history.

In 1935, Congress adopted the National Labor Relations Act (NLRA; 29 U.S.C. § 151 et seq.) (*Compton Education Assn., CTA/NEA* (1987) PERB Order No. IR-50, p. 16 (*Compton*), overruled in part on other grounds by *Fresno County In-Home Supportive Services Public Authority* (2015) PERB Dec. No. 2418-M, p. 33 (*Fresno County*))—which "regulates the employment relations of companies and their employees when such companies are engaged in activities in interstate commerce" (*California Federation of Teachers v. Oxnard Elementary Schools* (1969) 272 Cal.App.2d 514, 520 (*Oxnard*)). Under section 7 of the NLRA (Section 7), those "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and *to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .*" (29 U.S.C. § 157, italics added.) " 'These "concerted activities" . . . clearly include the right to strike . . . .' " (*G.C.*

---

[3] We grant the District's unopposed request for judicial notice of PERB's decision in this case and its regulations. (See *Assn. for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2024) 106 Cal.App.5th 982, 996 [PERB decisions]; *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 145 [regulations].) We treat the District's request for judicial notice of legislative history materials as " 'a citation to those materials that are published.' " (See *Madrigal v. Hyundai Motors America* (2025) 17 Cal.5th 592, 609, fn. 10.) Finally, we grant amicus curiae California School Boards Association's (CSBA) unopposed request for judicial notice of the Final Report of Assembly Advisory Council on Public Employee Relations (Aaron Report). (Evid. Code, § 452, subd. (c).)

*Breidert Co. v. Sheet Metal Workers Internat. Assn.* (1956) 139 Cal.App.2d 633, 638–639 (*G.C. Breidert*).)

Despite the NLRA, California retained the right to "impose upon the relationship of employer to employee such restrictions as reasonably may be deemed conducive to the general welfare." (*Oxnard, supra,* 272 Cal.App.2d at p. 520.) Pursuant to this authority, the Legislature in 1937 adopted Labor Code section 923—which establishes the policy of the state "concerning the regulation of employment relations in private industry." (*Oxnard,* at p. 520.) That section states in relevant part that "it is necessary that the individual workman . . . shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or *in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.*"[4] (Lab. Code, § 923, italics added.) The italicized language (concerted activities language)—which is identical to language in Section 7—"guarantees to those employed by a private business purely local in nature . . . the right . . . to participate in

_____

[4] Labor Code section 923 states in full: "In the interpretation and application of this chapter, the public policy of this State is declared as follows: [¶] Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

4

concerted activities to secure legitimate employment benefits"—including strikes. (*Oxnard*, at p. 521.) Labor Code section 923 does not, however, apply "to public employees, who occupy a status in relation to their employer different from that of their private counterparts . . . ." (*Oxnard*, at p. 521.)

Against this historical backdrop, the Legislature began responding to "the demands of public employees for a more effective and substantial voice in the determination of the terms and conditions of their employment." (*Oxnard*, *supra*, 272 Cal.App.2d at pp. 521–522.) Beginning in 1957, the Legislature adopted "a series of enactments designed to regulate separately various aspects of public employment." (*Id.* at p. 522.) In doing so, the Legislature attempted "to reconcile by selective innovation the divergent elements inherent in public employer-employee relations including the acknowledged distinctions in the status and obligations of public and private employees, as well as the various occupations and professions represented by public employment." (*Id.* at p. 523.)

In 1961, the Legislature adopted the George Brown Act (Brown Act) (former § 3500 et seq.)—which "granted public employees in California the right to organize and have their representatives 'meet and confer' with their employers over wages and working conditions." (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 603 (*San Jose*).) "Although public school employers and employees were originally" covered by the Brown Act, the Legislature, "in recognition of the unique relationship between public school employers and employees," adopted the Winton Act (Educ. Code, former § 13080 et seq.) in 1965. (*Westminster School Dist. v. Superior Court* (1972) 28 Cal.App.3d 120, 127 (*Westminster*).) The Winton Act applied "only to public school employers and employees." (*Westminster*, at p. 127.)

5

The Winton Act did "not embody the concept of collective bargaining" (*Westminster*, *supra*, 28 Cal.App.3d at p. 128) or grant a right to strike (*San Juan Teachers Assn. v. San Juan Unified School Dist.* (1974) 44 Cal.App.3d 232, 249 (*San Juan Teachers*)). Instead, it gave public school employees the right "to voice their views and ideas through recognized representatives and to have these views and ideas considered by the public school employer . . . ." (*Westminster*, at p. 128.) To this end, the Winton Act required the employer to " 'meet and confer "with representatives of employee organizations upon request with regard to all matters relating to employment conditions and employer-employee relations" ' " and " ' "the definition of educational objectives . . . ." ' " (*Oxnard*, *supra*, 272 Cal.App.2d at p. 524, quoting Educ. Code, former § 13085.) It also established "a factfinding procedure for resolving persistent disagreements." (*San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 860 (*San Mateo*).) But "the results of [that] procedure were not binding" (*ibid.*), and "all final decisions [were] left to the public school employer" (*Westminster*, at p. 128).

After taking public school employees out of the purview of the Brown Act, the Legislature expanded the rights of public employees still covered by that Act by enacting the Meyers-Milias-Brown Act (MMBA; § 3500 et seq.) in 1968. (*San Jose*, *supra*, 49 Cal.4th at p. 603.) The MMBA authorizes "public entities and labor representatives not only to confer but also to reach binding agreements on wages, hours, and working conditions." (*San Jose*, at p. 603.)

In 1974, a Court of Appeal held that the Winton Act gave public school employees the right to meet and confer about budgeting and spending priorities. (See *San Juan Teachers*, *supra*, 44 Cal.App.3d at pp. 257–258.) The very next year, the Legislature replaced that Act with EERA—which still governs today. (*San Mateo*, *supra*, 33 Cal.3d at p. 861.) The purpose of

6

EERA is "to promote the improvement of personnel management and employer-employee relations within the public school systems in the State of California by providing a uniform basis for recognizing the right of public school employees to join organizations of their own choice, to be represented by the organizations in their professional and employment relationships with public school employers, to select one employee organization as the exclusive representative of the employees in an appropriate unit, and to afford certificated employees a voice in the formulation of educational policy." (§ 3540.)

To accomplish this purpose, EERA "establishes a system of collective bargaining" (*San Mateo, supra,* 33 Cal.3d at p. 855) that "closely tracks" the MMBA system (*Redwoods Community College Dist. v Public Employment Relations Bd.* (1984) 159 Cal.App.3d 617, 621 (*Redwoods*)) and has "marked similarities" to the NLRA system (*San Diego Teachers Assn. v. Superior Court* (1979) 24 Cal.3d 1, 12 (*San Diego Teachers*)).  This system gives public school employees "significantly stronger" rights to bargain than the Winton Act.  (*San Mateo,* at p. 862.)  But in return, EERA limits the scope of matters subject to bargaining.  Those matters—i.e., "matters relating to *wages, hours of employment, and other terms and conditions of employment*" (§ 3543.2, subd. (a), italics added)—are therefore narrower than the matters subject to meet and confer under the Winton Act—i.e., "all matters relating to *employment conditions and employer-employee relations, including, but not limited to wages, hours and other terms and conditions of employment*" (Educ. Code, former § 13084, italics added).

Thus, EERA gives "[p]ublic school employees . . . the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-

7

employee relations." (§ 3543, subd. (a).) But "[t]he scope of [that] representation" is "limited to matters relating to wages, hours of employment, and other terms and conditions of employment." (§ 3543.2, subd. (a).) " 'Terms and conditions of employment' mean health and welfare benefits . . . , leave, transfer and reassignment policies, safety conditions of employment, class size, procedures to be used for the evaluation of employees, organizational security . . . , procedures for processing grievances . . ., the layoff of probationary certificated school district employees . . . , and alternative compensation or benefits for employees adversely affected by pension limitations . . . ." (*Ibid*.) Finally, EERA renders inapplicable "the provisions of [Labor Code] Section 923 . . . ." (§ 3549.)

As for negotiations over "wages, hours of employment, and other terms and conditions of employment" (§ 3543.2, subd. (a)), EERA imposes certain obligations on public school employers and employee unions. For example, an employer must "meet and negotiate" only "with representatives of employee organizations selected as exclusive representatives . . . upon request" (§ 3543.3) and do so "in good faith" (§ 3543.5, subd. (c)). Likewise, a union must "meet and negotiate in good faith with a public school employer of any of the employees of which it is the exclusive representative." (§ 3543.6, subd. (c).)

To "oversee and facilitate" these negotiations, EERA created PERB, "an independent board . . . appointed by the Governor with broad powers and duties to administer [EERA]."[5] (*San Mateo*, *supra*, 33 Cal.3d at p. 856; see §§ 3541, 3541.3.) It also established procedures so PERB could assist in

_____

[5] The name of the board was originally the Educational Employment Relations Board. It was renamed PERB in 1977. (*San Jose*, *supra*, 49 Cal.4th at pp. 603–604.)

resolving impasses during negotiations. Under these impasse procedures, "[e]ither a public school employer or the exclusive representative may declare that an impasse has been reached between the parties in negotiations" and ask PERB to "appoint a mediator for the purpose of assisting them in reconciling their differences and resolving the controversy on terms which are mutually acceptable." (§ 3548.) If PERB "determines an impasse exists," it must "appoint a mediator . . . ." (*Ibid.*) If the mediator "is unable to effect settlement of the controversy" and "declares that factfinding is appropriate to the resolution of the impasse, either party may . . . request that their differences be submitted to a factfinding panel." (§ 3548.1, subd. (a).) PERB appoints the "chairperson" of that panel unless the parties "mutually agree upon" one. (*Id.*, subds. (a), (b).)

The factfinding panel "may make inquiries and investigations, hold hearings, and take any other steps as it may deem appropriate." (§ 3548.2, subd. (a).) It has "the power to issue subpoenas requiring the attendance and testimony of witnesses and the production of evidence." (*Ibid.*) "If the dispute is not settled . . . , the panel shall make findings of fact and recommend terms of settlement." (§ 3548.3, subd. (a).) Those findings and recommendations are "advisory only" but become "public." (*Ibid.*) Both the public school employer and employee union have a duty to participate in good faith in these impasse procedures. (§§ 3543.5, subd. (e), 3543.6, subd. (d).)

Finally, EERA gives PERB the power "[t]o investigate unfair practice charges or alleged violations of" EERA. (§ 3541.3, subd. (i).) "The initial determination as to whether the charges of unfair practices are justified, and, if so, what remedy is necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of" PERB. (§ 3541.5.) In response to unfair practice charges, PERB may "take *any* action and make

9

*any* determinations . . . [*it*] *deems necessary to effectuate the policies of"* EERA. (§ 3541.3, subd. (i), italics added.) This includes the power "to issue a decision and order directing an offending party to cease and desist from the unfair practice and to take such affirmative action . . . as will effectuate the policies of" EERA. (§ 3541.5, subd. (c).) But "in an action to recover damages due to an unlawful strike," PERB may not "award strike-preparation expenses as damages" or "damages for costs, expenses, or revenue losses incurred during, or as a consequence of, an unlawful strike." (§ 3541.3, subd. (i).)

## FACTUAL BACKGROUND

### A.

Following a seven-day strike in early 2019 and lengthy negotiations that included an impasse declaration and fact finding, the District and OEA agreed to a new collective bargaining agreement effective from July 1, 2018 through June 30, 2021 (2019 CBA). During those negotiations, the District publicly stated that it would have to close some schools to meet OEA's "wage demands" and the District's Board of Education (Board) voted to close one school.

Even though they discussed their disagreements over school closures during the negotiations, the District and OEA did not resolve those disagreements in the 2019 CBA. Instead, they agreed to resolve them through a resolution introduced by one Board member for the Board's consideration. No assurances that the Board would adopt that resolution were given.

Nonetheless, the Board did adopt that resolution in March 2019. Under Resolution No. 1819-0178 (2019 Resolution), "no closure, merger, or consolidation would occur without inclusion of a planning period (*no less than*

10

*a school year or 9 months*) between the vote to approve the action and its implementation . . . ." (Italics added.) The District complied with the 2019 Resolution in closing some schools the next year.

After the 2019 CBA expired, the District and OEA reached a tentative agreement in November 2021 to extend that CBA until October 31, 2022.[6] Less than a month later, the Board introduced Resolution No. 2122-0026 (2022 Resolution)—which directed the District's superintendent (Superintendent) to present a list of schools to be closed starting June 2022. On January 12, 2022, the Board adopted the 2022 Resolution—which waived the nine-month "planning period" established by the 2019 Resolution.

The Superintendent provided a list of proposed school closures to the Board on January 31, 2022. Three days later, OEA sent the District a letter demanding that it bargain over the proposed closures and its decision to waive the nine-month planning period established by the 2019 Resolution.

On February 8, 2022, the District responded in writing that the proposed school closures were not "subject to negotiations" and that the 2019 CBA covered the impact of those closures. An hour later, OEA sent an e-mail to the District, "clarifying and amending" its demand to include a request to bargain over "the impacts and effects of the decision to close" schools. Roughly 30 minutes later, the Board held a meeting and voted to approve a modified version of the Superintendent's proposal—which included several school closures for the 2022–2023 school year.

Soon after the Board vote, the District began to implement the approved school closures. For example, the District notified impacted families on February 9 and 11, 2022 and met with parents and staff about the upcoming closures. The District also notified employees about their potential

---

[6] The District ratified the extension in April 2022.

transfers to new schools and the need to work with impacted families. Human resources staff met with employees about their upcoming transfers that same month.

On February 28, 2022, the District responded to OEA's February 8 e-mail. In its response, the District reiterated that it had no duty to bargain but asked OEA to "identify in writing" any effects it believed were bargainable. The District and OEA then exchanged several e-mails regarding OEA's demands.

On April 16, 2022, OEA sent a letter to its members, "announcing the opening of the [unfair practice] strike vote." The letter asked OEA members to authorize a one-day strike on Friday, April 29—which they did. The District learned about the proposed strike and sent OEA a cease-and-desist letter on April 23. On April 25, OEA sent the District "a notice of intent to strike," explaining that its members had authorized the strike in response to the District's "unfair labor practices in connection with its decision on February 8" to close schools. Roughly 95 percent of OEA's members "who work day-to-day" participated in the strike on April 29.

**B.**

On February 15, 2022, OEA filed an unfair practice charge against the District. PERB expedited the charge and issued a complaint in response to it on March 4. The complaint alleged that the District violated EERA by failing to provide: (1) notice or an opportunity to negotiate before it decided to waive the planning period established by the 2019 Resolution; and (2) notice and a "meaningful opportunity to negotiate over the reasonably foreseeable effects of its decision [to close schools] before implementation."

Two and a half weeks later, OEA asked PERB to seek injunctive relief to halt the District's "plan to close . . . three District schools at the end of the

12

2021–2022 school year." PERB denied the request "without prejudice" but expedited the "matter."

On April 27, 2022, the District filed an unfair practice charge against OEA. The next day, the District asked PERB to seek injunctive relief to prevent OEA's planned one-day strike on April 29. PERB denied the request for injunctive relief "without prejudice" but "order[ed] that this matter be expedited."

PERB issued a complaint in response to the District's charge on May 3, 2022. The complaint alleged that OEA "engaged in a one-day strike" before completing "the statutorily required impasse procedures" in violation of EERA.[7]

The parties stipulated that PERB should resolve OEA's complaint before resolving the District's complaint. PERB granted the stipulation and placed the District's complaint "in abeyance, while" OEA's complaint "[was] being expedited."

**C.**

In *Oakland Unified School Dist.* (2023) PERB Dec. No. 2875 *(Oakland Unified)*, PERB held that the District committed unfair practices in violation of EERA. PERB found that the District "must bargain over notice of a school closure, either in effects/implementation bargaining over a particular closure decision or as a mandatory subject if the issue arises as a proposed new or

---

[7] On May 1, 2023, the District moved to amend PERB's complaint in this case or to consolidate this case with its other unfair practice complaint against OEA. Through the motion, the District sought to add another one-day strike by OEA in March 2023 and another planned strike in May 2023 to the complaint in this case. PERB denied "[t]he request to amend the complaint" and "for consolidation." The District did not challenge this denial. (See *Oakland Education Assn.* (2024) PERB Dec. No. 2906, p. 12 *(Oakland Education)*.)

changed policy of general application." (*Oakland Unified*, at p. 15.)
Concluding that the District's decision to waive the nine-month "planning period" established by the 2019 Resolution was a change in policy, PERB found that the District violated EERA by refusing to bargain *before* making that decision. (*Oakland Unified*, at pp. 17–19.) PERB also found that the District violated EERA by failing to "provide adequate notice and opportunity to bargain in good faith over the implementation and effects of its specific school closure decisions." (*Oakland Unified*, at p. 19.) The District did not challenge this decision by PERB.

## D.

After PERB resolved OEA's complaint, it turned to the District's complaint. Affirming the administrative law judge's (ALJ) dismissal of that complaint, PERB "conclude[d] that OEA did not violate EERA." (*Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 2.)

As a threshold matter, PERB rejected the District's contention that OEA had no right to engage in an unfair practice strike. Relying on its own precedents and our Supreme Court's decision in *San Jose*, *supra*, 49 Cal.5th 597 (*Oakland Education*, *supra*, PERB Dec. No. 2906, at pp. 14–19), PERB held that OEA's "right to strike is statutorily protected" by EERA (*Oakland Education*, at p. 19). PERB, however, recognized that this "right is qualified . . . to the extent that it is inconsistent with another EERA provision—the duty to bargain in good faith." (*Ibid*.)

PERB then held that OEA did not breach its duty to bargain in good faith because it had no duty to bargain at all. (*Oakland Education*, *supra*, PERB Dec. No. 2906, at pp. 21–22.) According to PERB, "the District failed to provide adequate notice and opportunity to engage in good faith effects negotiations before implementing its decisions to change the nine-month

14

notice requirement in [the 2019 Resolution] and to close schools . . . after the 2021–2022 school year." (*Id.* at p. 22.)  Thus, OEA "had no duty to pursue negotiations" that would have been "futile as a matter of law." (*Ibid.*)

PERB also found that OEA did not breach its duty to bargain in good faith by engaging in a pre-impasse strike.  (*Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 30.)

First, PERB concluded that the strike was not " 'pre-impasse' " because "the parties were not engaged in [collective bargaining agreement] negotiations when OEA struck." (*Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 30.)  Indeed, "the District had already implemented its decision to abandon the nine-month notice period and had begun implementing its school closure decision" before providing "notice and an opportunity to bargain." (*Ibid.*)  According to PERB, "[i]t ma[de] no sense to require OEA to hold off on a strike until it reached an impasse given that the District's violation made good faith bargaining impossible . . . ." (*Ibid.*)

Second, even if OEA had engaged in a pre-impasse strike, PERB concluded "that OEA carried its burden in rebutting the presumption against [such] strikes." (*Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 30.)  To rebut that presumption, OEA had to prove that its strike " 'was provoked by' " the District's unfair practices and that it had negotiated " 'in good faith.' " (*Id.* at p. 23.)  Because PERB had already found that OEA had negotiated in good faith (*id.*, at pp. 21–22, 30), PERB concluded that OEA rebutted the presumption by establishing that its strike was provoked by the District's actions.  The District conceded that it had committed unfair practices when it did not challenge PERB's earlier decision holding that it had violated EERA.  (*Oakland Education*, at pp. 30–31.)  And there was

15

ample evidence that those unfair practices provoked OEA's strike. (*Id.* at pp. 31–33.)

Finally, PERB held that the ALJ did not err by excluding evidence of educational harm caused by the strike. (*Oakland Education*, *supra*, PERB Dec. No. 2906, at pp. 33, 36.)

Pursuant to section 3542, the District filed a petition for a writ of extraordinary relief from PERB's dismissal of its complaint (petition). We determined that a summary denial of the petition was not warranted and issued a writ of review.

## DISCUSSION

The District contends that PERB clearly erred by upholding the legality of OEA's unfair practice strike and affirming the ALJ's exclusion of evidence of educational harm caused by the strike. We disagree with the first contention but agree with the second. Nonetheless, we deny the District's petition because we find that the evidentiary error was harmless.

### A.

Although "courts retain final authority to ' "state the true meaning of [any] statute," ' " they " 'generally defer to PERB's construction of labor law provisions within its jurisdiction' " like EERA. (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912, 911 (*Boling*).) This is because " ' "PERB is 'one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." ' " (*Id.* at pp. 911–912.) We therefore " 'follow PERB's interpretation [of EERA] unless it is clearly erroneous.' " (*Id.* at p. 912.) We also defer to PERB whenever it makes "legal determinations even if based on undisputed facts" so long as "the matter falls within PERB's

16

area of expertise." (*Id.* at p. 913.) Finally, "[t]he findings of [PERB] with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, are conclusive." (§ 3542, subd. (c).)

**B.**

Because of the deference accorded to PERB, we begin with an overview of PERB's decisions addressing strikes and the appellate cases that inform those decisions.

Despite the enactment of EERA in 1975, the "legality of strikes by public employees in California . . . remained an open question." (*County Sanitation Dist. No. 2 v. Los Angeles County Employees' Assn.* (1985) 38 Cal.3d 564, 570 (*County Sanitation*).) In several cases in the early 1980s, the California Supreme Court held that PERB had initial exclusive jurisdiction to determine the legality of a strike under EERA without determining whether public school employees actually had the right to strike. (See, e.g., *El Rancho Unified School Dist. v. Nat. Education Assn.* (1983) 33 Cal.3d 946, 961 (*El Rancho*); *San Diego Teachers*, *supra*, 24 Cal.3d at p. 14; *Public Employment Relations Bd. v. Modesto City Schools Dist.* (1982) 136 Cal.App.3d 881, 894 (*Modesto*).)

Pursuant to this jurisdiction, PERB considered the legality of strikes under EERA in a series of decisions in the early 1980s.[8] In 1980, PERB held

---

[8] Strikes under collective bargaining statutes like EERA may include " 'unfair practice strikes,' " " 'economic strikes,' " and " 'sympathy strikes.' " (*Compton*, *supra*, PERB Order No. IR-50, at p. 41, fn. 6.) An unfair practice strike is a strike "in response to an employer's unfair labor practices." (*Ibid.*) "An economic strike is a 'cessation of work by employees to enforce economic demands upon the employer . . . .' " (*John Morrell & Co. v. Local Union 304A* (8th Cir. 1990) 913 F.2d 544, 548, fn. 4.) A sympathy strike "ordinarily refers to a strike conducted by workers belonging to one bargaining unit in support of a primary strike that is conducted by workers belonging to another

that "strikes are not unlawful per se under EERA" because they "comport[]
with the entire fabric of a collective negotiations statute that includes
impasse-breaking procedures." (*Fremont Unified Dist. Teachers' Assn.,
CTA/NEA* (1980) PERB Dec. No. 136, p. 23, vacated in part on other grounds
by *Fremont Unified Dist. Teachers' Assn., CTA/NEA* (1982) PERB Dec. No.
136a.) "Since strikes occur whether or not they are lawful," PERB explained
that "an absolute prohibition on strikes would negate the role . . . [it] is to
play in the 'long range minimization of work stoppages.'" (*Id.* at p. 24.)

Two years later, PERB reaffirmed that "strikes are not unlawful per se
under EERA." (*Westminster School Dist.* (1982) PERB Dec. No. 277, p. 14.)
Nonetheless, PERB held that a pre-impasse economic strike "intended to gain
concessions at the bargaining table," rather than an unfair practice strike
"provoked by the District's conduct," violated EERA. (*Westminster School
Dist.*, at pp. 16, 15; see *Fresno Teachers Assn., CTA/NEA* (1982) PERB Dec.
No. 208, p. 5 (*Fresno Teachers*).) "In the absence of employer provocation
which itself upsets the bargaining process," PERB concluded that a union
"must be strictly held to its duty under EERA to press its demands at the
bargaining table and through the statutory impasse procedures."
(*Westminster School Dist.*, at p. 17.)

In 1983, PERB upheld the legality of an unfair practice strike under
EERA in *Modesto Teachers Association, CTA/NEA* (1983) PERB Dec. No. 291
(*Modesto Teachers*). As a threshold matter, PERB observed that "[t]here is no
language in EERA which explicitly proclaims strikes to be illegal" even
though the Legislature included such language in Labor Code section 1962—

---

bargaining unit at the same plant or shop." (*Children's Hosp. Medical Center
v. California Nurses Assn.* (9th Cir. 2002) 283 F.3d 1188, 1191.) Only unfair
practice strikes are at issue here.

which expressly prohibits firefighters from striking.[9] (*Modesto Teachers*, at pp. 59–60.) Despite this intentional omission by the Legislature, PERB concluded that it "cannot hold that a work stoppage is protected unless there is language in EERA which actually authorizes such a decision." (*Id*. at p. 61.) PERB reached this conclusion because it believed that "pre-EERA appellate court decisions stand for the proposition that strikes are illegal unless authorized by statute." (*Id*. at p. 59, underscoring omitted.)

PERB found that statutory authorization in section 3543—which gives public school employees "the right, free from employer interference, 'to form, join, and participate in the activities of employee organizations of their own choosing.' " (*Modesto Teachers*, *supra*, PERB Dec. No. 291, at p. 61.) Although PERB acknowledged that Government Code section 3543 did not include the concerted activities language found in Section 7 and Labor Code section 923, it explained that Government Code section 3543, subdivision (a) "uses plainer and more universally understood language to clearly and directly authorize employee participation in collective actions traditionally related to the bargaining process," such as "work stoppages." (*Modesto Teachers*, at p. 62.)

PERB then observed that "while not all strikes are violative of EERA, a strike prior to the completion of impasse 'create[s] something similar to a rebuttable presumption' of an unlawful refusal to negotiate and/or participate in impasse. The presumption of illegality is rebuttable, however, by proof that the strike was provoked by employer conduct and that, further, the employee organization in fact negotiated and participated in impasse in good

---

[9] Labor Code section 1962 states in relevant part: "Employees . . . shall not have the right to strike, or to recognize a picket line of a labor organization while in the course of the performance of their official duties."

faith. Absent such evidence, the presumption stands, and a violation is established." (*Modesto Teachers*, *supra*, PERB Dec. No. 291, at pp. 62–63.) Concluding that the strike at issue "was provoked by the District, and that the [union] had participated in the collective bargaining process in good faith," PERB held "that the strike . . . was not in violation of EERA but was protected conduct." (*Id.* at p. 65.)

Two years later, the California Supreme Court removed the impediment to public employee strikes created by the "pre-EERA appellate court decisions" referenced in *Modesto Teachers*, *supra*, PERB Dec. No. 291, at page 59. In *County Sanitation*, the high court acknowledged that "the Court of Appeal and various lower courts in this and other jurisdictions have repeatedly stated that, absent a specific statutory grant, all strikes by public employees are per se illegal."[10] (*County Sanitation*, *supra*, 38 Cal.3d at p. 573.) Despite this, it observed that, under its own precedents, "the legality of strikes by public employees in California has remained an open question." (*Id.* at p. 570.)

Our Supreme Court then observed that "the Legislature has . . . chosen to reserve judgment on the general legality of strikes in the public sector."

_____

[10] Although only three justices signed onto the plurality opinion (see *County Sanitation*, *supra*, 38 Cal.3d at p. 592 (plur. opn. of Broussard, J.) [Mosk, J. and Grodin, J.]), Chief Justice Bird appeared to concur fully in the reasoning of that opinion (see *id.* at p. 609 (conc. opn. of C. J. Bird) ["today's holding is compelled . . . *by common law principles*" (italics added)]). She only wrote separately "to give the Legislature some guidance in an area filled with constitutional problems" (*id.* at p. 593) because she believed that public employees had a constitutional right to strike (*id.* at p. 594). Since four justices agreed with the reasoning of the plurality opinion, we treat that opinion as the holding of our high court. In doing so, we note that our high court cited the plurality opinion in *County Sanitation* with approval in 2010. (See *San Jose, supra,* 49 Cal.4th at pp. 705–706.)

(*County Sanitation, supra*, 38 Cal.3d at p. 571.) Although "the MMBA establishes a system of rights and protections for public employees which closely mirrors those enjoyed by workers in the private sector," the Legislature "intentionally avoided the inclusion of any provision which could be construed as either a blanket grant or prohibition of a right to strike." (*Id.* at p. 573.) "In the absence of clear legislative directive on this crucial matter," the high court found itself forced "to determine whether, under the [common] law, strikes by public employees should be viewed as a prohibited tort." (*Ibid.*)

Answering this question in the negative, our Supreme Court "conclude[d] that the common law prohibition against public sector strikes should not be recognized in this state." (*County Sanitation, supra*, 38 Cal.3d at p. 585.) Instead, "strikes by public employees are not unlawful at common law unless or until it is clearly demonstrated that such a strike creates a substantial and imminent threat to the health or safety of the public." (*Id.* at p. 586.) Without legislative guidance, courts must "determine on a case-by-case basis whether the public interest overrides the basic right to strike." (*Ibid.*)

Despite *County Sanitation* and earlier PERB decisions allowing strikes under EERA, a split PERB decision in 1987 cast doubt on the scope of the right to strike, if any, under EERA. In *Compton*, a majority of PERB's commissioners found " 'just and proper' " cause to "seek [the] enjoinment" of a post-impasse strike under EERA. (*Compton, supra*, PERB Order No. IR-50, at p. 9.)

In the lead opinion, Commissioner Porter held that "EERA does not grant to public school employees the right to strike for the purpose of collective bargaining or other mutual aid or protection . . . ." (*Compton*,

21

*supra*, PERB Order No. IR-50, at p. 9, underscoring omitted.)  After reviewing the history of California's collective bargaining statutes and case law, he found dispositive EERA's failure to include the concerted activities language found in Section 7 and Labor Code section 923.  (*Compton*, at pp. 65, 87–88.)  According to the commissioner, the Legislature, by intentionally omitting that language, "withheld and did not grant to public school employees . . . the right to strike." (*Id.* at p. 87, underscoring omitted.)  The commissioner also found that Government Code section 3549, which rendered Labor Code section 923 inapplicable, "reinforced" this conclusion.  (*Compton*, at pp. 89–90.)

Commissioner Porter further concluded that recognizing a right to strike "would bring EERA into direct conflict with the California Constitution and the Education Code." (*Compton*, *supra*, PERB Order No. IR-50, at p. 90.) According to the commissioner, "if public school employees may lawfully engage in a work stoppage for one day, they may lawfully extend it to one week; and, if a week, then a month; and, if a month, then two months; and so on. . . . [S]uch interference and disruption in the operation of the public schools directly contravenes the constitutional and statutory mandates concerning the operation of the schools and the constitutional rights of the children." (*Id.* at p. 91.)

Commissioner Porter then overruled *Modesto Teachers* and PERB's other decisions recognizing a right to strike under EERA.  (*Compton*, *supra*, PERB Order No. IR-50, at pp. 94–97, 102, 122.)  He also questioned the reasoning of *County Sanitation*: "[W]hile *County Sanitation* is applicable and controlling as to public employee strikes no longer being tortious under California common law . . . , the assumption of the plurality opinion as to the Legislature's intent and silence with respect to public employee strikes, as

22

well as its reasoning concerning MMBA [former] section 3509[,] is unpersuasive." (*Compton*, at p. 122, underscoring omitted.) Regardless, he reasoned that *County Sanitation* "does not alter our determination that public school employees do not have a right to strike under EERA" (*Compton*, at p. 46), because our high court "did not address" that issue (*id.* at p. 149, underscoring omitted). Finally, he concluded that all strikes are unfair practices under EERA (*Compton*, at pp. 123, 131, 141, 152–153) and that "work stoppages that interfere with or disrupt the operation of the public schools so as to affect the continuity and quality of educational services present just and proper cause for their enjoinment" (*id.* at p. 159).

Although Commissioner Hesse joined the lead opinion in authorizing injunctive relief (*Compton*, *supra*, PERB Order No. IR-50, at p. 170), she did not appear to agree that all strikes are unlawful under EERA. Instead, she only agreed that *Modesto Teachers* should be overruled to the extent that it held that EERA authorizes strikes. (*Compton*, at p. 164, fn. 3.) But because EERA did not "expressly . . . prohibit strikes," she concluded that "[t]he sole issue before the Board *in any strike case* is whether the facts of that strike can lead to a finding that the strike is an unlawful activity under EERA." (*Compton*, at p. 164, fn. 3, italics added). Finding that the strikes at issue were economic strikes, and not unfair practice strikes (*id.* at p. 169, fn. 8), Commissioner Hesse concluded that they violated EERA by causing "a total breakdown of two discrete activities that are guaranteed by statute and case law: (1) basic education for students and (2) negotiations free from coercive tactics that hold hostage that education." (*Compton*, at p. 167.) According to the commissioner, the schools had already "lost at a minimum [of] 16 instructional days" and faced "an unknown number of additional days of educational idleness." (*Id.* at p. 170.) Thus, "a cease and desist order that

23

comes one, two, or, three years after a strike cannot make up for the disruption and lost educational opportunities suffered by the students at the time of the strike." (*Ibid.*) Commissioner Hesse therefore agreed that injunctive relief was warranted. (*Ibid.*)

Commissioner Craib dissented. He found *Modesto Teachers* "persuasive" (*Compton*, *supra*, PERB Order No. IR-50, at p. 173), including its holding that "some strikes are protected under EERA" (*id.* at p. 174). Nonetheless, he agreed that the strikes at issue, "due to their intermittent nature," were "*unprotected*" by EERA. (*Compton*, at p. 174, italics added.) He did not, however, agree that they *violated* EERA. (*Compton*, at p. 175.) Because the strikes did not violate EERA, he concluded that PERB "has no jurisdiction to seek injunctive relief." (*Compton*, at p. 179.) Instead, the school district must "go directly to court to seek relief on some basis other than EERA." (*Ibid.*) It was also "free to take disciplinary action against the strikers (consistent with other laws)." (*Ibid.*)

Despite the uncertainty created by its split decision in *Compton*, PERB continued to use the rebuttable presumption framework articulated in *Modesto Teachers* to determine whether an unfair practice strike violated EERA. (See, e.g., *United Teachers-Los Angeles* (1990) PERB Dec. No. 803, pp. 2–3 [applying the *Modesto Teachers* framework]; *Santa Maria High School Dist. Faculty Assn., CTA/NEA* (1989) PERB Order No. IR-53, pp. 3–4 [same]; see also *Vallejo Education Assn., CTA/NEA* (1993) PERB Dec. No. 1015, p. 2 [affirming dismissal of unfair practice charge alleging an unlawful strike despite *Compton*].) In these cases, PERB did not mention, much less resolve, the split in *Compton*. (See *United Teachers-Los Angeles*, at pp. 2–3; *Santa Maria High School Dist. Faculty Assn.*, at pp. 3–4; see also *Vallejo Education Assn.*, at p. 2.)

Instead, PERB did not acknowledge the uncertainty created by *Compton* until 2003, when it observed that it was "unclear . . . how much of the plurality's analysis the concurrence [in *Compton*] joined, beyond its rejection of the finding in [*Modesto Teachers*] that EERA confers a statutory right to strike." (*San Marcos Unified School Dist.* (2003) PERB Dec. No. 1508, p. 25 (*San Marcos*).) Despite acknowledging this uncertainty, PERB did not address the legality of strikes under EERA because *San Marcos* involved "non-disruptive informational picketing." (*San Marcos*, at p. 26.) Similarly, in 2004, PERB asserted without explanation that "the right to strike is *limited*" by *Compton*. (*San Joaquin County Correctional Officers Assn.* (2004) PERB Dec. No. 1703-M, p. 5, fn. 4, italics added.)

PERB finally confronted this uncertainty by distinguishing *Compton* in 2010. [11] In *Regents of the University of California* (2010) PERB Dec. No. 2094-H (*Regents*), PERB held that the threat of an unfair practice strike did not violate the Higher Education Employer-Employee Relations Act (HEERA). (*Regents*, at p. 5.) In reaching this holding, PERB did not overrule *Compton* or acknowledge the conflict between *Compton* and *Modesto Teachers*. (*Fresno County*, *supra*, PERB Dec. No. 2418-M, at pp. 31–32.) Instead, PERB found that *Compton* did not control because it " 'did not overrule prior PERB decisions recognizing the legality . . . of unfair practice strikes.' "[12] (*Fresno County*, at p. 33, italics added.)

---

[11] In 2006, PERB declined to consider a request to overrule *Compton* and find "a right to strike" because it was not sufficiently alleged in the unfair practice charge. (*Santee Elementary School Dist.* (2006) PERB Dec. No. 1822, pp. 14–15.)

[12] Applying the *Modesto Teachers* rebuttable presumption framework, PERB held that pre-impasse strike threats and preparations violated HEERA because the union "failed to prove that" the public employer

25

PERB then eliminated any remaining uncertainty created by *Compton*, including its apparent conflict with *Modesto Teachers*, in 2015. In *Fresno County*, PERB overruled *Compton* "to the extent it holds that there is no statutorily-protected right to strike in protest against an employer's unfair practices." (*Fresno County*, *supra*, PERB Dec. No. 2418-M, at p. 33.) Reaffirming *Modesto Teachers* and its rebuttable presumption framework, PERB held that the "right to form, join and participate in the activities of employee organization encompasses the qualified right to strike . . ., including the right to strike in protest against unfair practices." (*Fresno County*, at p. 33.) Thus, "strikes by public employees are statutorily protected, except as limited by other provisions of . . . public-sector labor relations statutes and controlling precedent." (*Ibid.*) Since *Fresno County*, PERB has reaffirmed that public employees have a qualified right to strike. (See, e.g., *City and County of San Francisco* (2023) PERB Dec. No. 2867-M, p. 25.)

## C.

The District contends that *all* unfair practice strikes are illegal under EERA notwithstanding PERB's decisions to the contrary. The District further contends that OEA's strike violated several constitutional rights, including the rights to education, due process, and equal protection. We disagree. Based on our review of EERA and controlling case law, we find that PERB's conclusion that unfair practice strikes are allowed under EERA is not clearly erroneous. We therefore defer to that conclusion. (*Boling*, *supra*, 5 Cal.5th at p. 912.)

---

"committed any unfair practices." (*Regents*, *supra*, PERB Dec. No. 2094-H, at p. 33.)

**1.**

According to the District, nothing in EERA authorizes an unfair practice strike.  Thus, PERB clearly erred by manufacturing a right to engage in such strikes out of whole cloth.  The District, however, misframes the issue before us.  The issue is not whether EERA *authorizes* an unfair practice strike.  Rather, the issue, as dictated by California Supreme Court precedents establishing that public employees have a common law right to strike, is whether EERA *prohibits* unfair practice strikes.  Because nothing in EERA clearly prohibits such strikes, we must defer to PERB's conclusion that EERA allows them.

Forty years ago, the California Supreme Court held that "strikes by public sector employees in this state . . . are neither illegal nor tortious under California common law" "unless it has been determined that the work stoppage poses an imminent threat to public health or safety." (*County Sanitation*, *supra*, 38 Cal.3d at pp. 585, 592.)  In 2010, our high court reaffirmed this holding, reiterating that "[p]ublic employees have a right to strike *unless* it is clearly shown that there is a substantial and imminent threat to public health and safety." (*San Jose*, *supra*, 49 Cal.4th at p. 606.)  The public employees referenced in these two cases ostensibly include public school employees.

Nonetheless, the District contends that *County Sanitation* and *San Jose* do not apply here because they involved the MMBA, and not EERA.  But neither case relied on the MMBA to find a common law right to strike.  (See *County Sanitation*, *supra*, 38 Cal.3d at p. 573; *San Jose*, *supra*, 49 Cal.4th at pp. 605–607.)  Moreover, both cases relied on the similarities between EERA and the MMBA to hold that interpretations of EERA apply to the MMBA.  (See, e.g., *County Sanitation*, at p. 573 [construing former "section 3509 of the

27

MMBA" the same as "section 3549 of the EERA"]; *San Jose*, at p. 607 [applying EERA decisions to the MMBA]); see *Redwoods*, *supra*, 159 Cal.App.3d at p. 621 [EERA "closely tracks" the MMBA].)  Under that same reasoning, interpretations of the MMBA must also apply to EERA.  Indeed, the District identifies no differences between EERA and the MMBA that would render those cases inapplicable here.

Likewise, the failure of *County Sanitation* and *San Jose* to mention the constitutional right to education does not, as the District contends, lessen their relevance here.  Both cases, in finding that public employees have a qualified right to strike, considered whether those employees performed "services *essential to the public welfare.*"  (*San Jose*, *supra*, 49 Cal.4th at p. 608, italics added; see *County Sanitation*, *supra*, 38 Cal.3d at p. 586 [considering "essential areas of public employment (e.g., the prohibition against firefighters and law enforcement personnel)"].)  Thus, the reasoning of our high court in both cases encompasses the educational services at issue here.  In any event, as we explain later, the District cannot establish that all unfair practice strikes, much less OEA's one-day strike, violate the constitutional right to education.  (See, *post*, at pp. 37–39, 53–54.)

Thus, public school employees, like every other public employee, have a qualified right to strike—including a qualified right to engage in unfair practice strikes—under the common law.  (See *San Jose*, *supra*, 49 Cal.4th at p. 607 [*County Sanitation* established "the right of public employees to strike"].)  They may therefore engage in any unfair practice strike that does not imminently threaten public health or safety so long as no statute or constitutional provision prohibits them from doing so.  (See *Vernon Fire Fighters Assn. v. City of Vernon* (1986) 178 Cal.App.3d 710, 721 ["in the absence of some statutory prohibition, public employees have a right to

strike"].) In other words, public school employees do not lose their common law right to engage in unfair practice strikes under EERA unless EERA actually prohibits them from engaging in that strike. As explained below, EERA does not.[13]

In determining whether EERA deprives public school employees of their common law right to engage in unfair practice strikes, we follow our well-established canons of statutory construction. " ' " '[I]n construing a statute, a court [must] ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining that intent, we first examine the words of the respective statutes: 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.]' " ' " (*T.M. v. Superior Court* (2024) 104 Cal.App.5th 664, 681 (*T.M.*).) But if that language is ambiguous, then "courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." (*People v. Coronado* (1995) 12 Cal.4th 145, 151.) "Courts may also ' " ' "examine the context in which the [statutory] language appears, adopting the construction that best harmonizes the statute . . . with related statutes" ' " ' [citation], as well as consider ' " ' "public policy" ' " ' [citation]. The end goal is to ' " ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute . . . ." ' " ' " (*T.M.*, at p. 681.)

---

[13] Our conclusion that public school employees retain their common law right to engage in unfair practice strikes under EERA does not deprive PERB of initial exclusive jurisdiction over strikes by those employees because their strikes are still " 'arguably . . . prohibited' " as an unfair practice under EERA. (*San Jose, supra*, 49 Cal.4th at p. 606.)

Here, nothing in EERA expressly prohibits public school employees from engaging in unfair practice strikes. This alone provides a compelling reason to defer to PERB's conclusion that EERA allows them. (See *San Diego Housing Com. v Public Employment Relations Bd.* (2016) 246 Cal.App.4th 1, 12 ["the most compelling reason" to defer to PERB's interpretation of "the Act's factfinding provisions" is the absence of any "language in the Act expressly limiting the factfinding provisions to particular types of impasses"].) Indeed, the Legislature has included language expressly prohibiting strikes in collective bargaining statutes governing firefighters (Lab. Code, § 1962) but did not do the same in EERA. This omission strongly suggests that the Legislature did not intend to ban all strikes, much less all unfair practice strikes, by public school employees.[14] (See *People v. Sinohui* (2002) 28 Cal.4th 205, 213 [where the Legislature "knew how to include . . . a requirement but declined to do so," we are "confident [it] did not intend to" impose that requirement].)

Although the California Supreme Court has never determined whether unfair practice strikes are allowed under EERA, it too strongly suggests that they are. For example, our high court, in holding "that EERA divests the superior courts of jurisdiction to entertain a school district's complaint for damages arising out of a teachers' strike," concluded that an unfair practice strike "may constitute 'arguably protected' activity." (*El Rancho*, *supra*, 33

---

[14] In *Modesto Teachers*, PERB held that the absence of language in EERA expressly prohibiting strikes was not sufficient to establish a right to strike. (*Modesto Teachers*, *supra*, PERB Dec. No. 291, at p. 61.) But that holding was premised on Court of Appeal decisions suggesting that public employees had no right to strike absent a statutory authorization to do so. (*Id.* at p. 53.) Two years after *Modesto Teachers,* our Supreme Court dispelled this underlying premise when it held that public employees have a common law right to strike. (*County Sanitation, supra,* 38 Cal.3d at p. 585.)

Cal.3d at p. 961, 959.)  The court explained that its decision in *San Diego Teachers* "substantial[ly] support[ed]" this conclusion as did a Michigan Supreme Court case—which held that unfair practice strikes are allowed under "that state's Public Employment Relations Act . . . ." (*El Rancho*, at p. 958.)  More recently, our high court reaffirmed that "[p]ublic employees have a right to strike" (*San Jose*, *supra*, 49 Cal.4th at p. 606) due in part to EERA's silence on the legality of such strikes (*San Jose*, at p. 604).

Our Supreme Court's reasoning in *County Sanitation*, when taken to its logical conclusion, also establishes that a determination regarding the legality of unfair practice strikes under EERA is properly left to PERB.  In that case, our high court observed that the Legislature "intentionally avoided the inclusion of any provision which could be construed as either a blanket grant or prohibition of a right to strike, thus leaving the issue shrouded in ambiguity." (*County Sanitation*, *supra*, 38 Cal.3d at p. 573.)  Because there was no "clear legislative directive on this crucial matter," the high court concluded that "the Legislature has . . . chosen to reserve judgment on the general legality of strikes in the public sector." (*Id.* at pp. 573, 571.)  As a result, the Legislature left it to the judiciary, as part of its effort "to shape the common law" (*Arthur Andersen v. Superior Court* (1998) 67 Cal.App.4th 1481, 1507), to determine whether those strikes are prohibited under the common law (*County Sanitation*, at p. 573).  By parity of reasoning, in the absence of clear legislative directive on strikes in EERA, the Legislature has left it to PERB—the agency created by the Legislature to administer that law (*San Mateo, supra*, 33 Cal.3d at p. 856; §§ 3541, 3541.3)—to determine whether strikes are prohibited by EERA.  Indeed, "the legality of a public employee strike" is "an issue that goes to the essence of labor law" (*San Jose, supra*, 49 Cal.4th at p. 608)—the very subject matter in which PERB has

31

" ' "legislatively designated . . . expertise" ' " (*Boling*, *supra*, 5 Cal.5th at p. 912).

Thus, both the language of EERA and controlling case law strongly suggest that EERA does not prohibit all unfair practice strikes. Even if these suggestions are not conclusive, they, at a minimum, establish that PERB did not clearly err when it concluded that such strikes are allowed under EERA. (See *Boling*, *supra*, 5 Cal.5th at p. 912.)

Nevertheless, the District argues that PERB did clearly err because EERA does not include the concerted activities language found in Section 7—which gives employees the "right . . . to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (Compare 29 U.S.C. § 157 with § 3543, subd. (a).) According to the District, this omission means that EERA must prohibit unfair practice strikes. We agree that the concerted activities language confers a broad right to strike, including the right to engage in unfair practice strikes. (See *G.C. Breidert*, *supra*, 139 Cal.App.2d at pp. 638–639.) We also agree that the omission of that language from EERA appears intentional because the Legislature used it in other laws governing public employees.[15] But we do not agree that this omission establishes a legislative intent to prohibit all unfair practice strikes by public school employees.

This is because the language of section 3543, subdivision (a)—which gives public school employees the "right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of

---

[15] (See, e.g., Public Utilities Code, §§ 30755 [Southern California Rapid Transit Dist.], 99563 [Los Angeles County Metropolitan Transportation Auth.], 100300 [Santa Clara Valley Transportation Auth.], 101340 [Golden Empire Transit Dist.], 103400 [San Mateo County Transit Dist.], 125520 [North County Transit Dist.].)

representation on all matters of employer-employee relations"—appears to be broader than the concerted activities language. Not only did PERB reach this conclusion (*Modesto Teachers*, *supra*, PERB Dec. No. 291, at pp. 61–62; *Fresno County*, *supra*, PERB Dec. No. 2418-M, at p. 32), so did a Court of Appeal: "On its face the EERA language [in Government Code section 3543] . . . is *considerably broader* than that of . . . [S]ection 7" (*Redwoods*, *supra*, 159 Cal.App.3d at p. 623, italics added). Because "the right to strike is so inextricably intertwined with the . . . right to organize and collectively bargain" expressly granted by section 3543 (*County Sanitation*, *supra*, 38 Cal.3d at p. 589), we question whether PERB could have clearly erred when it held, consistent with federal NLRA precedent, that section 3543 authorizes unfair practice strikes (see *County of San Joaquin v Public Employment Relations Bd.* (2022) 82 Cal.App.5th 1053*,* 1069 (*San Joaquin*) ["it is proper to look to federal [NLRA] authority for [their] persuasive value"]).

We, however, need not answer this question in order to find that the omission of the concerted activities language does not establish a legislative intent to prohibit unfair practice strikes. That language gives employees the "right . . . to engage in . . . concerted activities" for two purposes: (1) "collective bargaining" or (2) "other mutual aid or protection." (29 U.S.C. § 157.) We are unable to conceive of any "concerted activities for the purpose of *collective bargaining*" (*ibid.*, italics added) that do not constitute "activities . . . for the purpose of *representation on all matters of employer-employee relations*" under section 3543, subdivision (a). (Italics added.) Nor has the District or any amicus curiae identified any. Thus, the only potentially material difference between Section 7 and Government Code section 3543, subdivision (a) is the failure of that subdivision to mention "concerted activities for the purpose of . . . other mutual aid or protection." (29 U.S.C. §

157.)  That omitted language does not, however, encompass unfair practice strikes—which are not conducted for "mutual aid or protection."[16]  (*Ibid.*)  As a result, the linguistic differences between Section 7 and Government Code section 3543, subdivision (a) cannot support a prohibition on *unfair practice* strikes.

Citing statutes from other states that include the language of section 3543, subdivision (a) *and* either the concerted activities language or language expressly prohibiting or authorizing strikes, the District counters that the language in subdivision (a) "is only an initial grant of basic union rights" that does not include the right to strike.  But statutory language must be construed in context.  (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 192–193.)  Thus, the District's argument that the relevant language of subdivision (a) has the same meaning in section 3543 as it does in statutes where the statutory scheme expressly addresses either concerted activities or strikes is a non sequitur.  In any event, the pertinent question is not whether EERA authorizes strikes but whether it prohibits them.  As explained above, it does not. (See, *ante*, at pp. 29–34.)  And even if the answer was less conclusive, we still cannot find that PERB clearly erred in finding that EERA allows unfair practice strikes.

Likewise, the District's invocation of section 3549 is unavailing.  That statute—which states that EERA "shall not be construed as making the provisions of Section 923 of the Labor Code applicable to public school employees" (§ 3549)— "does not prohibit strikes" (*San Diego Teachers*, *supra*, 24 Cal.3d at p. 13).  Rather, it "simply excludes the applicability of Labor Code section 923's protection of concerted activities."  (*Ibid.*)  Our Supreme

---

[16] In reaching this conclusion, we express no opinion as to the significance, if any, of this omission or its meaning.

Court made this clear in 1979 (see *ibid.*) and again in 1985 (see *County Sanitation, supra* 38 Cal.3d at p. 573 [like section 3549, former section 3509 cannot "be read as a legislative prohibition of public employee strikes"]).[17] And for the past 40 years, our high court has never offered, much less suggested, a contrary interpretation.

The District's contention that PERB erred by ignoring the observation in *San Mateo* that "[t]he language of . . . EERA defines a scope that appears significantly more limited than that under the Winton Act" fares no better. (*San Mateo, supra*, 33 Cal.3d at p. 861.) In making this observation, our high court was simply comparing the scope of matters subject to bargaining under EERA to the scope of matters subject to meet and confer under the Winton Act. (See *San Mateo*, at p. 861.) It was not commenting on the scope of any bargaining rights conferred by EERA. Indeed, the high court also observed in *San Mateo* that "[e]mployees' rights to bargain under EERA are *significantly stronger* than the right to meet and confer established by the earlier Winton Act." (*Id.* at p. 862, italics added and omitted.)

EERA's legislative history does not help the District either. Citing the Aaron Report—which was issued in 1973 and proposed various statutes that

_____

[17] Contrary to the District's assertion, the interpretations of section 3549 in *San Diego Teachers* and former section 3509 in *County Sanitation* are not dicta. (See *Appel v. Superior Court* (2013) 214 Cal.App.4th 329, 340 ["statements of law . . . necessary to the decision" are not dicta].) Indeed, both interpretations were necessary to our high court's decision in both cases. (See *County Sanitation, supra*, 38 Cal.3d at p. 573 [finding it necessary to "determine whether . . . strikes by public employees should be viewed as a prohibited tort" because former section 3509 did not prohibit them]; *San Diego Teachers, supra*, 24 Cal.3d at p. 13 [rejecting argument because section 3549 does not prohibit strikes].) In any event, "Supreme Court dicta 'is not to be blithely ignored,' and is typically followed by appellate courts." (*Dept. of Fair Employment & Housing v. Cisco Systems, Inc.* (2022) 82 Cal.App.5th 93, 103.)

would have given " 'public employees . . . [a limited] right to strike' " (*County Sanitation*, *supra*, 38 Cal.3d at p. 571, fn. 12)—the District and amicus curiae CSBA contend that the Legislature's failure to adopt these proposed statutes "supports the conclusion the EERA cannot be read to include a right to strike." But "[u]npassed bills, as evidences of legislative intent, have little value." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396.) Indeed, "the failure of the Legislature to adopt proposed amendments . . . could merely reflect a determination that such amendments were unnecessary because the law already so provided." (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1184.)

Similarly, the statement about strikes in the analysis of EERA by staff of the Senate Committee on Education does not compel a contrary conclusion. By explaining that "[s]ection 923 of the Labor Code is expressly made inapplicable to public school employees [through Government Code section 3549] *thereby negating the right to strike*" (Sen. Com. on Educ., Staff Analysis of Sen. Bill No. 160 (1974–1975 Reg. Sess.) May 1975, p. 4, italics added), the Committee likely meant that EERA did not incorporate the *full* scope of the right to strike granted by that Labor Code section. (See *San Joaquin*, *supra*, 82 Cal.App.5th at p. 1074 [recognizing "limitations" on the right of public employees to strike that do not exist "in private labor relationships"].) In any event, our high court held long ago that section 3549 does not prohibit strikes by public school employees. (*County Sanitation*, *supra*, 38 Cal.3d at p. 573; *San Diego Teachers*, *supra*, 24 Cal.3d at p. 13.) We are still bound by that holding today.

The District's assertion that PERB has been inconsistent in its rulings on the legality of unfair practice strikes under EERA also does not withstand scrutiny. Only one PERB commissioner has ever held that such strikes are

prohibited by EERA. (See *Compton*, *supra*, PERB Order No. IR-50, at p. 87.) And that holding in the lead opinion in *Compton* did not garner a majority because the other two commissioners did not join it. Indeed, the lone commissioner who concurred with the lead opinion did not address whether unfair practice strikes are illegal under EERA because she found that EERA does not prohibit strikes (*Compton*, at p. 164, fn. 3) and that the strikes at issue were economic strikes (*id.* at p. 169, fn. 8). Thus, PERB has *never* held that *all* unfair practice strikes are illegal under EERA. To the contrary, PERB has regularly held that EERA allows unfair practice strikes even after its decision in *Compton*. (See, *ante*, at pp. 17–26.)

Finally, by allowing unfair practice strikes, PERB does not contravene the purpose of EERA. As our high court explained, banning strikes by public employees does not necessarily " 'work to settle [labor] disputes or stop the strikes, slowdowns, or threats.' " (*County Sanitation*, *supra*, 38 Cal.3d at p. 582.) Instead, they may "exacerbate[] these conflicts." (*Ibid.*) Thus, PERB "could reasonably conclude that recognizing public employees' right to strike may actually enhance labor-management relations." (*Id.* at p. 581.) Although the high court reached these conclusions 40 years ago, they are no less binding on us today.

In short, neither the language, history, or purpose of EERA nor controlling case law supports a prohibition on all unfair practice strikes. We therefore defer to PERB's many decisions allowing such strikes under EERA. (See *Boling*, *supra*, 5 Cal.5th at p. 912 [must defer to PERB unless it is "clearly erroneous"].)

## 2.

In what appears to be a facial challenge, the District and some amici curiae contend that PERB, by allowing unfair practice strikes, violated the

37

right of students to a public education under the California Constitution. (Cal. Const., art. IX, §§ 1 & 5; see Educ. Code, § 202, subd. (c) ["Education is a fundamental right under the California Constitution"].) But even if the District has standing to assert this constitutional right on behalf of its students (compare *Selinger v. City Council* (1989) 216 Cal.App.3d 259, 271 [city has standing to assert its citizens's constitutional rights to notice and a hearing] with *City of Galt v. Cohen* (2017) 12 Cal.App.5th 367, 378 [city has no standing to assert the constitutional rights of its bondholders]), it has not established that an unfair practice strike always impairs that right (see *In re D.L.* (2023) 93 Cal.App.5th 144, 157 [facial challenge requires that the state action " ' " 'inevitably pose a present total and fatal conflict with applicable constitutional prohibitions' " ' "]). We therefore reject this constitutional challenge.

We do so because the California Constitution only requires "basic education equality" (*Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 489) and "does not prohibit all disparities in educational quality of service" (*Butt v. State of California* (1992) 4 Cal.4th 668, 686 (*Butt*)). For example, it does not mandate "a particular standard of achievement" or "a particular level of education expenditures" (*Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896, 915) or "guarantee uniformity of term length for its own sake" (*Butt*, at p. 686). Thus, "[e]ven unplanned truncation of the intended school term will not necessarily constitute a denial of 'basic' educational equality." (*Ibid.*) "Unless the actual quality of the [school] district's program, viewed as a whole, falls fundamentally below prevailing statewide standards, no constitutional violation occurs." (*Id.* at pp. 686–687.) Because a "finding of constitutional disparity depends on the individual facts" (*id.* at p. 686), the District cannot

show that every unfair practice strike, however long, meets the standard for a constitutional violation. PERB's decisions allowing such strikes under EERA do not therefore violate the right to education.

**3.**

Although it is less than clear, the District appears to contend that PERB violated its procedural due process rights because OEA's strike may have caused the District to violate its federal obligations. Despite the opacity of this contention, we understand enough to find that the District lacks standing to raise it.

The District is a political subdivision subject to the control of the Legislature. (*West Contra Costa Unified School Dist. v. Superior Court* (2024) 103 Cal.App.5th 1243, 1274 (*West Contra Costa*).) "This legislative control . . . is reflected in the well-established rule that subordinate political entities, as 'creatures' of the state, may not challenge state action as violating the entities' rights under the *due process . . . clause* of the federal Constitution" (*Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6 (*Star-Kist*), italics added) and the California Constitution (*West Contra Costa*, at p. 1274). Because "[p]olitical subdivisions cannot assert 'constitutional rights [like the right to due process] which are intended to limit governmental action vis-a-vis individual citizens,' " the District has no standing to assert a due process claim against PERB on its own behalf. (See *Star-Kist*, at p. 8.)

Despite this, the District argues that it has standing because its due process claim is "analogous" to supremacy clause claims exempted from this "no standing" rule by the California Supreme Court. In support, the District relies on a single sentence in our decision in *West Contra Costa*. In that sentence, we stated that a school district lacked standing to assert its due process claims because those claims "are not *analogous* to the supremacy and

39

commerce clause claims exempted by [our high court in] *Star-Kist*." (*West Contra Costa, supra,* 103 Cal.App.5th at p. 1274, italics added.) According to the District, that sentence means that it may assert due process claims against PERB that are analogous to supremacy clause claims.

The District, however, takes our sentence in *West Contra Costa* out of context and then reads too much into it. Just two sentences earlier, we quoted *Star-Kist* for the proposition that " '[p]olitical subdivisions cannot assert "constitutional rights which are intended to limit governmental action vis-a-vis individual citizens." ' " (*West Contra Costa, supra,* 103 Cal.App.5th at p. 1274.) And in support of the sentence invoked by the District, we cited two cases holding that political subdivisions may not assert claims based on constitutional provisions like the due process clause that protect individuals, rather than governments and their powers. (See *City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 593; *San Diego County Water Authority v. Metropolitan Water Dist. of Southern California* (2017) 12 Cal.App.5th 1124, 1162 (*San Diego Water*).) Because due process guarantees do not place a " 'structural limit[] on government power in the Supremacy Clause sense' " (*San Diego Water*, at p. 1162, fn. 24), due process claims, as we stated in *West Contra Costa*, at page 1274, "are not analogous to the supremacy . . . clause claims exempted by *Star-Kist*." Accordingly, the District lacks standing to assert its own due process claim here.[18]

**4.**

Citing data showing that roughly 90 percent of the students in the District are "non-white," that over 75 percent are "socioeconomically disadvantaged," and that over 15 percent have disabilities, the District

___

[18] Because we reject the District's due process claim on this ground, we do not address OEA's other arguments.

40

asserts that "PERB's [d]ecision also creates a fundamental equal [protection] violation." Presumably, the District is asserting that PERB's decision, by allowing OEA's unfair practice strike, had a disparate impact on minority, socioeconomically disadvantaged, and disabled students because of the high percentage of those students in the District. The District, however, ignores the threshold question for any equal protection claim premised on a disparate impact: Did PERB's decision "cause" that disparate impact? (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 648 (*Vergara*) [the "initial question" in determining whether a disparate impact violates equal protection is "[d]id the *challenged statutes*" cause the "disproportionate harm" to minority students].) Because the answer to that question is no, the District's equal protection claim fails.

Indeed, the District presented no evidence that any PERB decision, much less its decision in this case, caused any disparate harm to minority, socioeconomically disadvantaged, or disabled students. Union members, *not* PERB, vote to strike, and there is no evidence that PERB's actions precipitated a strike in any way. This is illustrated by the facts in this case. OEA members, not PERB, voted to strike. PERB's actions could not have precipitated the strike because the District did not even file its unfair practice charge with PERB until *after* OEA threatened to strike. OEA also conducted the strike well before PERB rendered its decision upholding the legality of the strike. Thus, PERB's decision in this case could not have caused the strike, much less any disparate impact resulting from that strike.

In any event, unfair practice strikes like OEA's strike are likely to occur even if PERB had held that EERA prohibited them. "[W]ithout the right to strike, . . . public employees have little negotiating strength. This, in turn, produces frustrations which . . . *often provoke 'illegal' strikes*." (*County*

41

*Sanitation*, *supra*, 38 Cal.3d at p. 582, italics added.) This is confirmed by the many public employee strikes that occurred in the past despite pre-*County Sanitation* case law suggesting that those strikes were illegal. (See *id.* at p. 581 ["46 strikes occurred during 1981-1983, which actually marks a significant decline when compared to the number during the 5 previous years"].) Our high court has also observed that barring strikes may not be "the most effective means of minimizing the number of teaching days lost from work stoppages." (*San Diego Teachers*, *supra*, 24 Cal.3d at p. 11.) Because there is no evidence that PERB's decisions, as opposed to OEA's frustrations over the District's school closures, caused the strike, there can be no equal protection violation.[19] (See *Vergara*, *supra*, 246 Cal.App.4th at p. 651 [no equal protection violation because any "constitutional infringement is the product of staffing decisions, not the challenged statutes"].)

### D.

Even if unfair practice strikes are allowed under EERA, the District and amicus curiae CSBA contend that PERB clearly erred by allowing OEA to strike before it had exhausted certain administrative remedies. For example, the District contends that unfair practice strikes should not be allowed before PERB has determined that the public school employer has, in fact, committed an unfair practice. The District and CSBA also contend that EERA, by establishing rigorous impasse procedures, prohibits pre-impasse unfair practice strikes. We disagree with both contentions and find that PERB did not clearly err by allowing pre-impasse unfair practice strikes before it has fully adjudicated the underlying unfair practice charge.

---

[19] It does not matter whether the District is asserting a facial or an as applied challenge because both challenges must be rejected for the reasons stated. We therefore need not address any other arguments raised by OEA.

**1.**

In arguing that EERA prohibits unfair practice strikes before PERB has adjudicated the underlying unfair practice charge, the District cites no provision in EERA that actually states this. This is not surprising. EERA is "silent on [the] subject" of the right to strike. (*San Jose*, *supra*, 49 Cal.4th at p. 604.) Instead, the District claims that EERA's authorization of "PERB to adjudicate unfair practice charges" evidences a legislative intent to limit unfair practice strikes in this manner. But the District identifies no language in EERA that supports this claim. This is presumably because EERA gives PERB broad discretion to handle unfair practice charges however it sees fit. For example, section 3541.3, subdivision (i) gives PERB the power to "take *any* action and make *any* determinations in respect of [unfair practice] charges . . . *as the board deems necessary to effectuate the policies of this chapter.*" (Italics added.) This includes the power to "devise[] and promulgate[]" almost any "[p]rocedures for investigating, hearing, and deciding" those charges.[20] (§ 3541.5.) In light of PERB's broad discretion over unfair practice charges, we cannot conclude that PERB clearly erred by upholding the legality of unfair practice strikes conducted before its adjudication of the underlying charge. (*Boling*, *supra*, 19 Cal.5th at p. 912.)

Decisions by the National Labor Relations Board (NLRB) interpreting the NLRA reinforce this conclusion. As the District acknowledges, these decisions have long established that unions may strike in response to an employer's unfair labor practice (ULP) before their underlying ULP charge has been adjudicated.[21] Because EERA "is similar in many ways to the

---

[20] The few statutory limits placed on this power are not relevant here. (See § 3541.5, subds. (a)–(b).)

[21] The District and PERB both cite the following NLRB decisions for this proposition: *Golden Stevedoring Co.* (2001) 335 NLRB 410, 411; *RGC*

NLRA" (*McPherson v. Public Employment Relations Bd.* (1987) 189 Cal.App.3d 293, 305 (*McPherson*)), "it is proper to look to" these NLRB decisions "for [their] persuasive value" (*San Joaquin*, *supra*, 82 Cal.App.5th at p. 1069). Indeed, PERB must provide "justifications peculiar to the educational employment sphere to support" any departure from those federal decisions. (*McPherson*, at p. 311.)

According to the District, PERB clearly erred in failing to find a justification for departing from those NLRB decisions based on the linguistic differences between EERA and the NLRA. But California courts often do not find those differences "dispositive" (*Redwoods*, *supra*, 159 Cal.App.3d at p. 624) and have regularly required PERB to follow NLRA precedent "despite differences in statutory language" (*McPherson*, *supra*, 189 Cal.App.3d at p. 311). Where, as here, the linguistic differences between EERA and the NLRA have no apparent bearing on the legality of unfair practice strikes (see, *ante*, at pp. 32–34), we cannot conclude that PERB clearly erred.

The District also contends that the educational harm caused by unfair practice strikes justifies a departure from NLRA precedent. But the District ignores other policy considerations that support PERB's decision to follow that precedent here. The purpose of EERA is "to promote the improvement of personnel management and employer-employee relations within the public school systems in the State of California." (§ 3540.) Unfair practice strikes arguably advance this purpose because they give public school employees, who would otherwise have "little [bargaining] strength," an outlet for "frustrations" that may "exacerbate" conflicts with their employers. (*County Sanitation*, *supra*, 38 Cal.3d at p. 582.) Forcing those employees to wait to

---

*(USA) Mineral Sands, Inc.* (2001) 332 NLRB 1633, 1633; and *Dorsey Trailers, Inc.* (1999) 327 NLRB 835, 855.

44

respond to unfair practices, " 'in some instances, years before a final disposition by [PERB] is rendered,' " may send a " 'clear message' " that PERB cannot provide meaningful relief. (*Modesto*, *supra*, 136 Cal.App.3d at p. 903.) Where, as here, the employer violated its statutory duty to bargain in good faith—thereby, relieving its employees of "any duty to bargain" (*Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 21)—that lengthy delay before a final disposition could make both employers and employees less likely to comply with their obligations under EERA. This would, in turn, frustrate the purpose behind EERA. (See *Modesto*, at p. 903 [forcing public school employees to wait for meaningful relief from PERB creates "a significant possibility the Act's remedial purposes would be frustrated"].)

In deciding whether PERB properly looked to NLRA precedent for guidance here, we need not weigh these competing policy considerations. (See *San Mateo*, *supra*, 33 Cal.3d at p. 863 ["Particularly in the field of education a strong public policy renders the welfare of those receiving the service a primary consideration"].) Indeed, we are not experts in educational labor relations. But PERB is. And PERB " 'bring[s] expertise and uniformity to the delicate task of stabilizing labor relations.' " (*San Joaquin*, *supra*, 82 Cal.App.5th at p. 1074.) This is why we "need to defer to the expertise of PERB so it can perform its mandated duty to effectuate and implement the purposes" of EERA. (*Modesto*, *supra*, 136 Cal.App.3d at p. 894.) Because the weighing of any competing policy considerations is properly left to PERB, we do not find that PERB clearly erred by allowing unfair practice strikes under EERA before it has determined that the employer committed an unfair practice.

In making this finding, we note that PERB already has the power to prevent any harm caused by an unfair practice strike before it adjudicates

the underlying unfair practice charge. Specifically, PERB " 'may petition the court for appropriate temporary relief or restraining order' " enjoining any strike. (*Modesto*, *supra*, 136 Cal.App.3d at p. 895, quoting § 3541.3, subd. (j).) To obtain that injunctive relief, PERB only has to establish that there is "reasonable cause to believe an unfair practice ha[s] been committed" and that the relief sought is "just and proper." (*Ibid.*) In determining whether reasonable cause exists, PERB need not find that "an unfair labor practice has in fact been committed." (*Id.* at p. 902.) Instead, "the key question is . . . whether PERB's theory . . . is *insubstantial* or *frivolous*." (*Id.* at p. 897.) And in determining whether injunctive relief is just and proper, PERB may consider any "pertinent" fact, including the harms caused by the strike. (*Id.* at p. 903.) Because PERB has the power to prevent any harm caused by a strike before finding an unfair practice, we cannot conclude that PERB clearly erred by allowing unfair practice strikes before adjudicating the underlying charge.

The District discounts PERB's ability to seek injunctive relief because "PERB has repeatedly refused to enjoin teacher strikes for decades." According to the District, PERB's standard for injunctive relief "is flawed." Even if this is so, it merely suggests that this standard should be changed— an issue not before us today. It does *not* establish that PERB erred by allowing unfair practice strikes before it has determined whether an unfair practice has, in fact, been committed.

Nonetheless, we share the District's concern that PERB's use of an erroneous standard for injunctive relief or its misapplication of that standard may go unchecked because its refusal to seek such relief may not be subject to review by either PERB or the courts. But based on the representations of the parties at oral argument, it does not appear that the reviewability of that

refusal has ever been decided by PERB or a court.[22]  Our own review of the
relevant case law suggests that this is so.  In any event, we need not consider
that issue here because the District did not challenge PERB's refusal to seek
injunctive relief in its petition.

Finally, we reject the District's claim that allowing unfair practice
strikes before adjudication of the underlying charge violates the due process
rights of its students.  Assuming that the District has standing to assert
these rights (see, *ante*, at p. 38), it provides no "reasoned argument and legal
authorities" to support this due process claim.  (*People v. Sorden* (2021) 65
Cal.App.5th 582, 603 ["failure to present reasoned argument and legal
authorities in support" of a claim of error forfeits that claim on appeal].)  To
the extent that the due process claim is premised on a deprivation of the
constitutional right to education, we have already rejected that premise.
(See, *ante*, at pp. 37–39.)  In any event, we do not see how the mere existence
of educational harm creates a due process right to a final adjudication of the
unfair practice charge before an unfair practice strike may occur.  We also do
not see why the availability of injunctive relief is insufficient to alleviate any
procedural due process concerns.  We therefore conclude that PERB did not
clearly err in allowing unfair practice strikes before adjudication of the
underlying charges.

---

[22] At oral argument, OEA's counsel argued that PERB's refusal to seek
injunctive relief may be judicially reviewed through a writ petition under
section 3509.5 and presumably section 3549.  PERB's counsel, on the other
hand, stated that he was not aware of any fully adjudicated challenges to
such a refusal but suggested, without conceding, that PERB may be able to
address such a challenge when it resolves the underlying unfair practice
charge or that a court may address it through a claim for declaratory relief.
Finally, the District's counsel questioned whether PERB's refusal to seek
injunctive relief was reviewable because he had never seen it done before.

**2.**

Citing differences between the impasse procedures in EERA and the MMBA, CSBA contends that EERA must prohibit unfair practice strikes before the parties have completed its impasse procedures. We agree that EERA's impasse procedures are more extensive than the MMBA's impasse procedures. (Compare §§ 3548–3548.8 to §§ 3505.2, 3505.4–3505.7.) But we disagree that these differences require PERB to prohibit pre-impasse unfair practice strikes like OEA's strike. PERB does not prohibit all pre-impasse strikes provoked by an employer's unfair practices because it "would reward unclean hands" and because those practices have "made good faith bargaining impossible." (*Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 30.) Neither of those reasons depends on the impasse procedures themselves. Indeed, once the employer has violated its duty to bargain in good faith, *any* impasse procedure—which is "rooted in the duty to bargain" and depends on the employer's good faith (*ibid.*)—becomes pointless and ineffective. Thus, PERB did not clearly err by allowing pre-impasse unfair practice strikes notwithstanding EERA's rigorous impasse procedures.

**E.**

At the evidentiary hearing on the District's complaint, the ALJ excluded any evidence of educational harm caused by OEA's one-day strike. The District contends that PERB clearly erred by affirming this evidentiary ruling. We agree but find the error to be harmless.

**1.**

We begin by reciting the facts relevant to this evidentiary issue.

Before the evidentiary hearing on the District's complaint, OEA moved to exclude evidence of educational harm suffered by the District and its students due to the strike. According to OEA, that evidence was "irrelevant

48

to the lawfulness of [the] strike and should be excluded." In its opposition, the District contended that this harm was relevant "to PERB's determination of a proper remedy . . . ." At the hearing on OEA's motion, the District again argued that evidence of educational harm was relevant to its remedy. In its offer of proof, the District stated that it wished to introduce evidence of the instructional time for "students both in the general education and in the [s]pecial [e]ducation categories" lost due to the strike. The District did not, however, argue that this harm was relevant to OEA's liability. The ALJ granted OEA's motion and excluded any evidence of educational harm.

In its posthearing brief, the District again argued that the ALJ erred by excluding evidence of educational harm caused by the strike because it was "quintessential to PERB's determination of a proper remedy." According to the District, that harm included "loss of instructional time, loss of time for legally mandated services to the most vulnerable children, denial of nutritional services to children, [and] denial of safe spaces during the school day." Again, the District did not argue that this harm was relevant to OEA's liability under EERA.

Instead, the District made this argument for the first time in its statement of exceptions to the ALJ's proposed decision. In that statement as well as in its reply, the District asserted that evidence of educational harm was relevant to the issue of "provocation" and "the [l]awfulness of [a]n [u]nfair [p]ractice [s]trike." The District also reiterated that this evidence was "essential to PERB's determination of a proper remedy for the District."

In affirming the ALJ's exclusion of evidence of educational harm caused by the strike, PERB concluded that the issue of the evidence's relevance to remedy was "moot" because "the District has not established liability." (*Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 33.) PERB then found

that the District forfeited its argument that the evidence was relevant to liability because it did not raise the argument in its response to OEA's prehearing motion. (*Id.* at p. 35.) PERB also rejected the District's invocation of the "total breakdown standard" used to determine whether injunctive relief is warranted because "there is no injunctive relief request before" it. (*Id.* at pp. 35–36.) Finally, PERB concluded that, even if that standard applied here, the evidence proffered by the District did not meet it. (*Id.* at p. 36.)

**2.**

The District contends that evidence of educational harm caused by the strike was relevant to both OEA's liability and the District's remedy. We agree and find that PERB clearly erred by excluding it.

First, evidence of educational harm was relevant to the remedy if the District had prevailed. Although PERB concedes this, OEA does not, arguing that this evidence only "related to infeasible, ambiguous" remedies that the District could not obtain. Because we must defer to PERB's interpretation of EERA unless it is clearly erroneous, we reject OEA's argument for this reason alone. (*Boling*, *supra*, 5 Cal.5th at p. 912.) In any event, we would reach the same conclusion without PERB's concession. "PERB possesses 'broad' remedial powers enabling it 'to take action . . . necessary to effectuate the policies of' " EERA. (*Internat. Federation of Prof. & Technical Engineers v. Bunch* (1995) 40 Cal.App.4th 670, 679.) Those policies include furthering "the public interest in maintaining the continuity and quality of educational services." (*San Diego Teachers*, *supra*, 24 Cal.3d at p. 11.) Regardless of any limits on the remedies that PERB may order, PERB cannot effectuate this policy without considering the educational harm caused by the strike.

50

Second, evidence of educational harm was relevant to OEA's liability under EERA.  As an initial matter, we decline to find that the District forfeited this argument by failing to raise it below (*Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 35) or in its petition and opening brief.  As PERB concedes, the District did make this argument in its exceptions to the ALJ's proposed decision.  And the District's petition and opening brief, although they could have been much clearer, did arguably assert that evidence of educational harm was relevant to liability.  In any event, we exercise our discretion to consider the issue because PERB and OEA had ample notice of it and because of its importance.  (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 479.)

Turning to the merits, we find, as conceded by PERB at oral argument, that this evidence was relevant to liability.  As our high court explained over 55 years ago, EERA "requires" that PERB "use its power . . . in ways that will further the public interest in maintaining the continuity and quality of educational services." (*San Diego Teachers*, *supra*, 24 Cal.3d at p. 11.)  Thus, PERB cannot "ignore 'the larger harm' involved in a teachers' strike" when determining whether that strike violates EERA. (*El Rancho*, *supra*, 33 Cal.3d at p. 957.)

This conclusion is buttressed by PERB's own decisions.  As PERB has explained, "a strike may constitute an unfair practice" if the union fails "to negotiate in good faith." (*Fresno Teachers*, *supra*, PERB Dec. No. 208, at p. 11.)  Indeed, a strike that "amounts to an unlawful pressure tactic" may constitute "a refusal to bargain in good faith." (*Assn. of Building, Mechanical and Electrical Inspectors* (2010) PERB Dec. No. 2141-M, p. 9 (*Inspectors*).)

In determining whether a public sector union has bargained in good faith, PERB has acknowledged that it must consider the "public interest"

(*Inspectors*, *supra*, PERB Dec. No. 2141-M, at p. 13), including the "public interest in education" (*Fremont Unified School Dist. Teachers Assn.* (1990) PERB Order No. IR-54, p. 11 (*Fremont Teachers*)).  Thus, PERB has regularly "considered *the impact of protected activity on third parties*."  (*Inspectors*, at p. 13, italics added.)  For example, PERB held that the picketing of "neutral employers" by a public sector union constituted an "unfair pressure tactic in violation of the MMBA" (*Inspectors*, at pp. 13, 12), because it "harmed the public interest by enmeshing" those employers in the union's "dispute with" the public employer (*id*. at p. 13).  Similarly, PERB held that an "intermittent strike" conducted by public school employees violated their "duty to bargain in good faith" under EERA because the strike prevented the school district "from effectively maintaining the continuity and quality of education . . . ." (*Fremont Teachers*, at p. 11.)

Considering the harm to students and their families when determining whether a strike constitutes an unfair practice under EERA only makes sense because that same harm already limits the "economic pressure devices" that school districts may use to respond to the strike.  (*Fremont Teachers*, *supra*, PERB Order No. IR-54, at p. 11.)  As PERB has recognized, school districts, unlike private employers, may not use lockouts or discharges to respond to a strike because of "[t]he public interest in education . . . and the employees' property rights in their employment . . . ." (*Ibid.*)  If lockouts and discharges may constitute unfair practices under EERA because of their impact on students and their families, then the same must be true for strikes. We therefore find that PERB erred by affirming the ALJ's exclusion of evidence of educational harm caused by the strike.

52

**3.**

Although we find that evidence of educational harm caused by the strike should not have been excluded, we find that this error was harmless here. The exclusion of that evidence had no bearing on the District's remedy because PERB dismissed the District's unfair practice complaint. It also had no bearing on OEA's liability because the harm caused by OEA's one-day strike was no greater than the harm caused by *any* work stoppage. In its offer of proof, the District only stated that it wished to introduce evidence of the loss of instructional time and school services caused by the loss of one school day due to the strike. It did not identify anything unusual about the strike or the lost school day. Because *every* strike by public school employees results in the loss of at least *one* day of school, OEA's strike caused no more harm than *any other strike*. Thus, the excluded evidence could not have made a difference here. If it did, all strikes would be prohibited, paradoxically negating the need for that evidence. In any event, we must defer to PERB's decisions holding that unfair strikes are allowed under EERA notwithstanding the educational harm that may be caused by such strikes. (See, *ante*, at pp. 17–26, 37–39.) Thus, the exclusion of evidence of educational harm in this case was harmless.[23]

In reaching this conclusion, we do not intend to minimize the disruption caused by OEA's one-day strike. As amicus curiae Tu Tran explained on a personal level, OEA's one-day strike noticeably harmed her daughter's education and caused considerable inconvenience and discomfort

---

[23] The District may not rely on the cumulative harm caused by this one-day strike in 2022 and subsequent strikes conducted by OEA in 2023 because the District did not challenge the denial of its motion to include those later strikes as part of this case. (See *Oakland Education*, *supra*, PERB Dec. No. 2906, at p. 12.)

to her and her children. Indeed, we have no doubt that OEA's strike caused real harm to the students and families in the District. We also wholeheartedly agree that these work stoppages should be prevented at all costs.

Nonetheless, we cannot conclude, based on the record before us, that PERB clearly erred in concluding that OEA's unfair practice strike did not violate EERA. Because of PERB's expertise in labor relations, particularly its expertise in minimizing work stoppages, we must defer to that conclusion here. (*Boling*, *supra*, 5 Cal.5th at p. 912.)

## DISPOSITION

The petition is denied.

CHOU, J.

WE CONCUR.

JACKSON, P.J.
BURNS, J.

*Oakland Unified School District v. Public Employment Relations Board*
(A171007)

54

_Oakland Unified School District v. Public Employment Relations Board_ (A171007)

Counsel:        Fagen Friedman & Fulfrost, Roy A. Combs, Mary Breffle and Isabella Marra for Petitioner.

Atkinson, Andelson, Loya, Ruud & Romo, Mark Bresee and Brooklyn Robertson; California School Boards Association, Kristin Lindgren-Bruzzone, Ethan T. Retan, Dana Scott and Olabode Owoyele for California School Boards Association and its Education Legal Alliance as Amicus Curiae on behalf of Petitioner.

Atkinson, Andelson, Loya, Ruud & Romo, Michael J. Davis, Scott K. Holbrook and Benjamin R. Wang; Association of California School Administrators, Iván Carrillo and Dorothy Johnson for Association of California School Administrators as Amicus Curiae on behalf of Petitioner.

Tu Tran, in pro. per., as Amicus Curiae on behalf of Petitioner.

Sloan Sakai Yeung & Wong, Timothy G. Yeung and Jeffrey Sloan as Amicus Curiae on behalf of Petitioner.

Public Employment Relations Board, J. Felix De La Torre, Mary Weiss, Joseph W. Eckhart and Gabriel H. Orea for Respondent.

Weinberg, Roger & Rosenfeld, Kerianne Steele, Katharine R. McDonagh and R. Maxwell Sinclair for Service

Employees International Union, Local 1021 as Amicus Curiae on behalf of Respondent.

California Teachers Association, Mandy Hu for Real Party in Interest.